# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KATHI LUCAS, JORGE LOPEZ, AND
KEITH A. FEATHER, individually and as
representatives of a class of participants and
beneficiaries on behalf of the Duke Faculty
and Staff Retirement Plan,

No. 1:18-cv-00722

*Plaintiffs*,

COMPLAINT—CLASS ACTION

v.

DUKE UNIVERSITY,

JURY TRIAL DEMANDED

*Defendant*.

## COMPLAINT

1.     Plaintiffs Kathi Lucas, Jorge Lopez, and Keith A. Feather, individually and

as representatives of a class of participants and beneficiaries in the Duke Faculty and

Staff Retirement Plan (the "Plan"), bring this action under 29 U.S.C. §1132(a)(2) on

behalf of their Plan against Defendant Duke University for breach of fiduciary duties

under the Employee Retirement Income Security Act (ERISA) to enforce Duke's

personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting

from each breach and to restore to the Plan all profits Duke made through its use of the

Plan's assets.

## JURISDICTION AND VENUE

2.     **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the

subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it

is an action under 29 U.S.C. §1132(a)(2).

3. **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the subject Plan is administered, where at least one of the alleged breaches took place, and where Duke resides or may be found.

4. **Standing.** Section 1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id*. at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue on behalf of the plan to the plan's remedies. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered over $1 million in losses caused by Duke University's breach, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs on behalf of the Plan. To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury, because their accounts in the Plan would have been increased had Duke not taken revenue sharing for its own benefit and instead delivered that revenue sharing to the Plan for distribution among participant accounts and because each Plaintiff invested in a Plan investment that paid such revenue sharing. Specifically, during the class period, among other investments: Plaintiff Lucas invested in the Fidelity Disciplined Equity and CREF Stock funds; Plaintiff Lopez invested in the T. Rowe Price Retirement fund; and Plaintiff

2

Feather invested in the CREF Social Choice and TIAA Traditional funds. All of these funds, and other funds in which Plaintiffs invested, paid revenue sharing from which Duke benefitted itself as alleged herein.

## PARTIES

5. The Duke Faculty and Staff Retirement Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34). It is a qualified trust under 26 U.S.C. §403(b).

6. The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1) ("Plan document").

7. Faculty and staff members of Duke University are eligible to participate in the Plan, which provides the only source of retirement income for many of them. Plan participants' retirement income depends upon deferrals of their compensation, contributions by Duke, and the performance of investment options net of fees and expenses.

8. As of December 31, 2015, the Plan held $4.8 billion in assets and had 40,363 participants with account balances. As such, it is one of the largest defined contribution plans in the United States, ranking in the top 0.018% in asset size of all defined contribution plans that filed a Form 5500 with the Department of Labor. Plans of such great size are commonly referred to as "jumbo plans".

9. Kathi Lucas resides in Durham, North Carolina, and is currently retired. She previously served as Project Leader in Duke's Clinical Research Institute at Duke

University. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

10.     Jorge Lopez resides in Miami, Florida, and was a Service Access Manager for Duke Family Medicine. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plan.

11.     Keith A. Feather resides in Hillsborough, North Carolina, and is a Case Manager at Duke University. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plan.

12.     Duke University ("Duke") is a non-profit corporation organized under North Carolina law with its principal place of business in Durham, North Carolina. Under §§ 13.02, 13.03, and 13.08 of the Plan document and 29 U.S.C. §1102(a), Duke is the Named Fiduciary and Plan Administrator with fiduciary responsibility for the control, management and administration of the Plan. Duke has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to enable Duke to properly carry out such responsibilities, including the selection and compensation of Plan recordkeepers and arranging with Plan recordkeepers rebates of excess revenue sharing. Duke acted as alleged herein through its Board of Trustees, or one or more committees thereof, and its officers, including without limitation, its Vice President of Human Resources and Vice President of Administration.

13.     Duke is a fiduciary to the Plan because it exercised discretionary authority and discretionary control respecting the management of the Plan, exercised authority and control respecting the management or disposition of Plan assets, and had discretionary authority and discretionary responsibility in the administration of the Plan, by controlling the disposition of excess revenue sharing that Plan recordkeepers made available to the Plan and by diverting that excess revenue sharing to accounts from which Duke paid itself putative reimbursements for salaries and fringe benefits of its employees, as described more fully below. 29 U.S.C. §1002(21)(A)(i) and (iii).

## ERISA FIDUCIARY STANDARDS

14.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Duke as fiduciary of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that a fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

15.     Plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. §1103(c)(1).

16.     Supplementing these general fiduciary duties, certain transactions are prohibited *per se* by 29 U.S.C. §1106 because they entail a high potential for abuse. Section 1106(a)(1) [ERISA §406(a)] states, in pertinent part, that the fiduciary

shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
  (C) furnishing of goods, services, or facilities between the plan and  party in interest; [or]
  (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]

17.     As the employer of the participants in the Plan and a fiduciary, Duke is a

party in interest. 29 U.S.C. §1002(14)(A) and (C).

18.     Under 29 U.S.C. §1106(b) [ERISA §406(b)], fiduciaries are prohibited

from engaging in self-dealing with Plan assets. Section 1106(b) provides that the

fiduciary

shall not—
  (1) deal with the assets of the plan in his own interest or for his own account, [or]
  (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries[.]

19.     "Section 406(b) prohibits a plan fiduciary from engaging in various forms

of self-dealing. Its purpose is to 'prevent[] a fiduciary from being put in a position where

he has dual loyalties and, therefore, he cannot act exclusively for the benefit of a plan's

participants and beneficiaries.'" *Reich v. Compton*, 57 F.3d 270, 287 (3d Cir. 1995)

(Alito, J., quoting H.R. Rep. No. 93-1280 (1974)); see also 29 C.F.R. §2550.408b-

2(e)(1).

20.     The DOL explains in 29 C.F.R. § 2550.408b-2(e)(1):

These prohibitions are imposed upon fiduciaries to deter them from exercising the authority, control, or responsibility which makes such persons fiduciaries when they have interests which may conflict with the

6

interests of the plans for which they act. In such cases, the fiduciaries have interests in the transactions which may affect the exercise of their best judgment as fiduciaries.

21. Although ERISA provides for exemptions from §1106(a) prohibited transactions (as set forth in 29 U.S.C. §1108 and the regulations thereunder), there are no exemptions from §1106(b) prohibited transaction. 29 C.F.R. §2550.408b-2(a); 29 C.F.R. §2550.408b-2(e); *Barboza v. Cal. Ass'n of Prof'l Firefighters*, 799 F.3d 1257, 1269 (9th Cir. 2015)(citing *Patelco Credit Union v. Sahni*, 262 F.3d 897, 910–11 (9th Cir. 2001)); *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich*., 751 F.3d 740, 750 (6th Cir. 2014); DOL Adv. Op. 89-09A (June 13, 1989)(1989 ERISA LEXIS 9).

22. 29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## BACKGROUND FACTS

23. Defined contribution plans allow employees to contribute a percentage of their pre-tax earnings to the plan, with the employer often matching those contributions up to a specified percentage. Each participant in the plan has an individual account.

7

Participants direct plan contributions into one or more investment options in a lineup selected and maintained by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015).

24.     The majority of fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping) and investment management. These expenses "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

25.     The plan's fiduciaries control defined contribution plan expenses. The fiduciaries are responsible for hiring administrative service providers for the plan, such as a recordkeeper, and for controlling the amount of compensation received by those administrative service providers. The fiduciaries also control what investment options are provided in the plan.

26.     Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or

8

investment advice. These services are largely commodities, and the market for recordkeeping services is highly competitive.

27.     Investment options in §403(b) plans include only mutual funds and insurance company annuities. Both investment types deduct fees from the assets in the investment that are a percentage of the daily value of the assets. The total percentage of all fees deducted from the investment expressed on an annualized basis is called an "expense ratio." For example, if the mutual fund deducts fees from its assets that are equal to 1% of assets on an annualized basis, the fund's expense ratio would be 1%, which is usually expressed in terms of hundredths of a percent (basis points), or 100 basis points (bps). The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors.

28.     Many mutual funds engage in a practice known as "revenue sharing." In a revenue-sharing arrangement, a mutual fund pays a portion of its asset-based fees to the entity that provides recordkeeping services to a plan, which is usually calculated as a percentage of the plan's assets invested in the fund. (Insurance company annuities engage in the same practice.) The difference in fees between a mutual fund's retail and institutional share classes is often attributable to revenue sharing. To illustrate, a fund's retail share class may have an expense ratio of 100 bps, including 25 bps of revenue sharing, while the institutional share charges 75 bps, with no or lesser revenue sharing.

29.     There are two primary methods for defined contribution plans to pay for recordkeeping: direct payments from plan assets or the employer and indirect revenue sharing payments from plan investments.

30.     In a typical direct payment arrangement, the fiduciary contracts with the recordkeeper for recordkeeping services for a flat annual fee based on the number of participants (for example, $30 per participant for 40,363 participants, or $1,210,890 per year). In an indirect, revenue sharing arrangement, plan investment options pay the plan's recordkeeper an asset-based fee based on the amount of plan assets invested in the fund. Because the revenue sharing payments are asset based, the fees will increase as plan assets increase even if the number of participants or level of services does not change. Thus, a recordkeeper's compensation can (and usually does) increase without any change in the services it is providing.

31.     A prudent fiduciary that allows revenue sharing to pay for recordkeeping monitors the amount of the revenue sharing the recordkeeper receives each year and limits the recordkeeping compensation to a reasonable, fixed level by obtaining rebates of any revenue sharing amounts that exceed that level.

## DUKE'S BREACH AND PROHIBITED TRANSACTIONS

32.     Since 2011 and until January 2019, Duke engaged four recordkeepers for the Plan and allowed each of those providers to put their own proprietary investment funds in the Plan—resulting in a total of more than 400 investment options in the Plan. These investment options include mutual funds and insurance company variable annuity

products offered by the Teachers Insurance and Annuity Association of America and College Retirement Equities Fund ("TIAA-CREF"), the Vanguard Group Inc. ("Vanguard"), Fidelity Investments ("Fidelity"), and the Variable Life Insurance Company ("VALIC"). Most of these investment options paid revenue sharing to these recordkeepers as the sole source of compensation for recordkeeping services to the Plan.

33.     Duke was informed at least as early as 2010 that the Plan's investment options were providing revenue sharing that overpaid for the Plan's recordkeeping services provided by TIAA, Fidelity, and VALIC by more than $3.5 million per year.

34.     Instead of recovering excess revenue sharing for the Plan, Duke arranged with Fidelity, TIAA-CREF, and VALIC for those companies to pay Plan expenses and to reimburse Duke for its own expenses putatively in administering the Plan, including paying salaries and fringe benefits of employees in Duke's Human Resources department and other expenses Duke previously had been paying itself. Duke first established this arrangement in 2011, arranging for Fidelity to make available $750,000, TIAA-CREF to make available $630,000, and VALIC to make available $80,000 for payment of putative Plan expenses. These amounts were made available for 12 months and expired if they were not used to pay Plan expenses. In 2013, Fidelity increased its amount to $1.2 million. Duke first started paying itself from these Plan assets in 2012.

35.     Duke did not arrange for returning excess revenue sharing back to the Plan for allocation to participant accounts until 2014, when it arranged revenue credits programs, but then only with Fidelity and TIAA (not VALIC). Under those programs, the

11

Plan was to receive only the amounts that remained after Duke paid itself for the salaries and fringe benefits of its employees and other expenses that it incurred. Duke did not arrange for the revenue credit programs to include all amounts of excess revenue sharing that participant investments had generated in prior years. Despite establishing these revenue credit programs in 2014, Duke did not arrange for the transfer of excess revenue sharing to participant accounts until September 2016.

36.     Duke did not cease paying itself from the Plan's excess revenue sharing until August 2016, after it discovered that Plaintiffs' attorneys were investigating fiduciary breaches in the Plan. Plaintiffs commenced case number 16-CV-1044 in this Court on August 10, 2016 to recover their Plan's losses from their fiduciaries' breach of duty in causing the Plan to incur excessive recordkeeping administrative expenses and excessive investment management fees, and in causing the Plan to provide imprudent investment options.

37.     All excess revenue sharing amounts were Plan assets, since they constituted excessive fees generated from participant investments, and that should have been restored to the Plan.

38.     Duke took for itself out of these Plan assets over $1,500,000 in putative reimbursement of employee salaries and fringe benefits the following amounts:

12

| 2012 | $   319,931.48 |
| 2013 | $   323,448.86 |
| 2014 | $   332,968.74 |
| 2015 | $   343,417.98 |
| 2016 | $   238,347.86 |
| **Total** | **$ 1,558,114.92** |

39.     Duke decided not to reduce the number of recordkeepers in the Plan, to negotiate reasonable and lower recordkeeping fees for the Plan, or to remove or reduce high-fee mutual funds and annuities from the Plan that paid revenue sharing because it sought to maintain enough excess revenue sharing payments to pay itself for employee salaries and fringe benefits and other expenses.

40.     These payments included both the amount of salary Duke paid to its employees and an additional amount that represented an estimate of the fringe benefits Duke provided to its employees but were not calculations of the actual amounts of the costs Duke incurred and were in fact payments of overhead expenses. These fringe benefits included the amounts that Duke contributed to the Plan as employer on behalf of these employees.

41.     Duke did not enter into any contract or formal arrangement, much less a reasonable contract or arrangement, for reimbursement of proper Plan expenses, but instead just paid itself from Plan assets under this scheme when it had a clear conflict of interest with the Plan and Plan participants. Duke did not hire an independent fiduciary to determine whether it was in the interest of the participants to engage in this scheme or whether the services that Duke employees performed were necessary for the operation of

the Plan, whether the amounts charged for those services were reasonable, and whether Duke was being reimbursed only its direct expenses incurred in providing necessary services to the Plan.

42.     Duke did not disclose this scheme to Plan participants, particularly that Duke had arranged this scheme on its own without any review or approval by an independent fiduciary. Plaintiffs did not discover this scheme until they pursued discovery in case number 16-CV-1044 in the first half of 2018.

## CLASS ACTION ALLEGATIONS

43.     29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

44.     In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Duke Faculty and Staff Retirement Plan from August 14, 2012, through the date of judgment.

45.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

14

a.     The Class includes over 20,000 members and is so large that joinder of all its members is impracticable.

b.     There are questions of law and fact common to this Class because Duke owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: whether Duke is a fiduciary as to the conduct at issue in this action; whether Duke breached its fiduciary duties to the Plan; whether Duke's breach is a prohibited transaction under §1106(a) and/or §1106(b); whether Duke is exempt from its §1106(a) prohibited transaction under 29 U.S.C. §1108; how Duke has profited from its use of Plan assets; what are the losses to the Plan resulting from Duke's breach; and what Plan-wide equitable and other relief the court should impose in light of Duke's breach of duty.

c.     Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Duke's alleged breach.

d.     Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

15

e.     Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Duke in respect to the discharge of its fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

46.     Plaintiffs' counsel, Schlichter Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a.     Schlichter, Bogard & Denton has been appointed as class counsel in 17 other ERISA class actions regarding excessive fees in large defined contribution plans. As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62 million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in representing employees and retirees

16

seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206, at 4–5 (S.D.Ill. July 17, 2015). In that same case, Judge Reagan recognized that the law firm of "Schlichter, Bogard & Denton has had a humungous impact over the entire 401(k) industry, which has benefited employees and retirees throughout the entire country by bringing sweeping changes to fiduciary practices." *Abbott*, 2015 U.S. Dist. LEXIS 93206, at 9 (internal quotations omitted).

     b.    Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D. Ill. June 26, 2012).

     c.    "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8 (C.D. Ill. Oct. 15, 2013).

     d.    "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S.Dist.LEXIS

12037 at 8 (S.D. Ill. Jan. 31, 2014). The court also emphasized that "the law firm of Schlichter, Bogard & Denton is the leader in 401(k) fee litigation." *Id.* at 8 (internal quotations omitted).

e.      U.S. District Court Judge Baker acknowledged the significant impact of the firm's work by stating that as of 2013 the nationwide "fee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte*, 2013 U.S. Dist. LEXIS 184622, at 6 (emphasis added).

f.      U.S. District Judge Herndon of the Southern District of Illinois, recognized the firm's extraordinary contributions to the retirement industry: "Schlichter, Bogard & Denton and lead attorney Jerome Schlichter's diligence and perseverance, while risking vast amounts of time and money, reflect the finest attributes of a private attorney general[.]" *Beesley*, 2014 U.S. Dist. LEXIS 12037, at 8.

g.      U.S. District Court Judge G. Patrick Murphy recognized the work of Schlichter Bogard & Denton as exceptional:

> Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work … investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This

18

case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans.

*Will v. Gen. Dynamics Corp.*, No. 06-698, 2010 U.S.Dist.LEXIS 123349, at 8–9

(S.D.Ill. Nov. 22, 2010).

h.      Schlichter Bogard & Denton handled the only full trial of an ERISA

excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was

affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc*., 746 F.3d 327 (8th Cir.

2014). In awarding attorney's fees after trial, the district court concluded that

"Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc*.,

No. 06-4305, 2012 U.S.Dist.LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012).

Following remand, the district court again awarded Plaintiffs' attorney's fees,

emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA

litigation, including educating the Department of Labor and federal courts about

the importance of monitoring fees in retirement plans:

> Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations.

*Tussey v. ABB, Inc.,* No. 06-4305, 2015 U.S.Dist.LEXIS 164818, at 7–8 (W.D.

Mo. Dec. 9, 2015).

19

i. In *Spano v. Boeing Co.*, in approving a settlement reached after nine years of litigation which included $57 million in monetary relief and substantial affirmative relief to benefit participants, the court found that "[t]he law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one, which have educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees." No. 06-cv-743, Doc. 587 at 5–6 (S.D.Ill. Mar. 31, 2016) (Rosenstengel, J.) (internal quotations omitted).

j. Recently, in approving a settlement including $32 million plus significant affirmative relief, Chief Judge William Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, Doc. 61, at 7–8 (M.D.N.C. Sept. 29, 2016) found that "Class Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]"

k. On November 3, 2016, Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter, Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill,

efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. November 3, 2016).

        l.     Schlichter Bogard & Denton is also class counsel in and handled *Tibble v. Edison International*—the first and only Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" 135 S. Ct. at 1829. Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

        m.    The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016);[1] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[2] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);[3] Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16,

---

[1] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[2] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[3] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

2014);[4] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST.

J. (Aug. 25, 2015);[5] Jess Bravin and Liz Moyer, *High Court Ruling Adds*

*Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); [6] Jim

Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[7]

Mark Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*,

REUTERS (May 1, 2014);[8] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison*

*Worker Appeal*, BLOOMBERG (Oct. 2, 2014).[9]

47.    This Court certified a class action under Rule 23(b)(1) alleging ERISA

fiduciary breaches regarding the same Plan and appointed the same Plaintiffs as class

representatives and their firm as class counsel in case number 16-CV-1044 on April 13,

2018 (Doc. 96) and this action should be certified under Rule 23(b)(1) for the same

reasons.

## COUNT I

48.    Plaintiffs restate all of the foregoing allegations.

49.    Duke dealt with the assets of the Plan in its own interest and for its own

---

[4] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[5] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[6] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[7] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[8] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[9] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

22

account by diverting revenue sharing to itself for reimbursement of employee salaries and fringe benefits and other expenses instead of recovering that revenue sharing for the Plan and Plan participants. 29 U.S.C. §1106(b)(1).

50.     Duke dealt with the assets of the Plan in its own interest and for its own account by maintaining four recordkeepers in the Plan and their proprietary investment options and keeping as Plan investments mutual funds and annuities that paid excessive amounts of revenue sharing to the Plan vendors and generated excess revenue sharing. 29 U.S.C. §1106(b)(1).

51.     By establishing expense reimbursement accounts and revenue credit programs that delivered revenue sharing to Duke in the form of reimbursement of employee salaries and fringe benefits and other expenses instead of delivering revenue sharing to the Plan and by paying itself from those accounts, Duke acted on behalf of a party whose interests were adverse to the interests of the Plan or the interests of its participants or beneficiaries (namely, itself). 29 U.S.C. §1106(b)(2).

52.     The payments to itself described above constitute prohibited transactions by Duke as a fiduciary to the Plan and Duke is obligated to disgorge to the Plan all amounts it received and must make good to the Plan all losses the Plan suffered from being deprived of those assets, namely, the gains the Plan would have earned had those amounts been restored to the Plan. 29 U.S.C. §1109(a); *Barboza*, 799 F.3d at 1269; *Hi-Lex Controls*, 751 F.3d at 750.

53.     To the extent that the arrangement and payments described above are

determined not to constitute prohibited transactions under §1106(b), they are prohibited transactions under §1106(a) because Duke, acting through its officers, employees, and agents, caused the Plan to engage in transactions—payment of excess revenue sharing to Duke and allowing Duke employees to provide services to the Plan—that it knew or should have known constituted a direct or indirect furnishing of services between the Plan and a party in interest (Duke) or the transfer to, or use by or for the benefit of a party in interest (Duke), of Plan assets in the form of revenue sharing. 29 U.S.C. §1106(a)(1)(C)–(D).

54. Although ERISA provides that §1106(a) "shall not apply to ... (2) Contracting or making reasonable arrangements with a party in interest for ... services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor" (29 U.S.C. §1108(b)(2) [ERISA §408(b)(2)]), to satisfy that exemption Duke must prove that each service for which Duke was reimbursed was (1) "necessary for the establishment or operation of the plan", (2) "furnished under a contract or arrangement which is reasonable," and (3) "[n]o more than reasonable compensation is paid for such ... service." 29 C.F.R. §2550.408b-2(a). Proving satisfaction of this exemption is an affirmative defense on which Duke has the burden of proof.

55. Without conceding the satisfaction of any element of 29 C.F.R. §2550.408b-2(a), Plaintiffs contend Duke cannot satisfy that exemption at least for the following reasons.

56. The services for which Duke was reimbursed were not provided to the Plan under any reasonable contract or arrangement between the Plan and those individuals or Duke, much less a written contract that specified the services to be provided, how they were necessary for the operation of the Plan, or the compensation to be paid for such services. Instead, Duke just requested, and obtained for itself, reimbursement of these expenses after the fact.

57. The amounts paid to Duke were not reasonable because they were more than the Plan would have paid had a loyal and prudent fiduciary engaged experienced providers for such services—indeed, the same services to the extent necessary to the operation of the Plan were provided or could have been provided by the Plan's four recordkeepers— and because the reimbursements were not for direct expenses, in that Duke would have sustained the expense of its employees' salaries and fringe benefits even if those employees had not provided any services to the Plan. 29 C.F.R. §2550.408c-2(b).

58. Duke was entitled to receive reimbursement of employee salaries and other expenses without engaging in a prohibited transaction under §1106(a) only if an independent fiduciary determined the services provided by the employee were necessary to the operation of the Plan and the reimbursement to Duke was reasonable and constituted only the reimbursement of direct expenses. 29 C.F.R. § 2550.408b-2(e), §2550.408c-2(b); DOL Adv. Op. 89-09A (June 13, 1989); DOL Adv. Op. 97-03A (Jan. 23, 1997). An independent fiduciary did not determine the services for which Duke

University was reimbursed were necessary to the operation of the Plan, that the amount of the reimbursement was reasonable for the services provided, or that the reimbursement paid only direct expenses under 29 C.F.R. § 2550.408b-2(e) and §2550.408c-2(b). Duke's making those determinations on its own and for its own benefit was a clear conflict of interest and prohibited transactions under §1106(b).

59.     Duke further breached its fiduciary duties to the Plan under 29 U.S.C. §1104(a)(1)(A) and (B) by failing to recover for the Plan all excess revenue sharing participant investments in the Plan had generated in the years preceding the establishment of the reimbursement credit programs. The Plan suffered losses from that breach in the amount of that revenue sharing and the gains that the Plan would have earned had the revenue sharing been restored promptly to the Plan.

**JURY TRIAL DEMANDED**

60.     Under Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

**PRAYER FOR RELIEF**

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare that Duke breached its fiduciary duties as described above;

- Find and adjudge that Duke is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty and all

26

profits Duke made from it use of Plan assets, and to otherwise restore the Plan to the position it would have occupied but for Duke's breach;

- Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- Order Duke to provide all accountings necessary to determine the amounts it must make good to the Plan and to determine Duke's profits from its use of Plan assets under §1109(a);

- Surcharge against Duke and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, or otherwise in violation of ERISA;

- Certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter Bogard & Denton LLP as Class Counsel;

- Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law;

- Prohibit Duke from receiving any Plan assets, even as putative reimbursement of employee salaries, unless an independent fiduciary acting solely in the interest of the Plan determines that such a payment complies with ERISA; and

- Grant other equitable or remedial relief as the Court deems appropriate.

Respectfully submitted,

/s/ David B. Puryear, Jr.
David B. Puryear, Jr.
North Carolina State Bar No. 11063
PURYEAR AND LINGLE, PLLC
5501-E Adams Farm Lane
Greensboro, NC 27407
(336) 218-0227
puryear@puryearandlingle.com

*Local Counsel for Plaintiffs*


SCHLICHTER BOGARD & DENTON LLP
Jerome J. Schlichter, MO State Bar No. 32225*
Michael A. Wolff, MO State Bar No. 38207*
Kurt C. Struckhoff, MO State Bar No. 61873*
100 South Fourth Street, Ste. 1200
St. Louis, MO 63102
Phone: (314) 621-6115
Fax: (314) 621-5934
jschlichter@uselaws.com
mwolff@uselaws.com
kstruckhoff@uselaws.com
*To be admitted *Pro Hac Vice*

*Lead Counsel for Plaintiffs*